IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

CIVIL NO.  1:04CV213

PATRICIA C. COLVIN,                )
                                   )
              Plaintiff,           )
                                   )
        Vs.                        )        MEMORANDUM AND ORDER
                                   )
JO ANN B. BARNHART,                )
Commissioner of Social Security,   )
                                   )
              Defendant.           )
_____)

**THIS MATTER** is before the Court on the parties' cross-motions for

summary judgment.  For the reasons stated herein, the Plaintiff's motion is

granted and the Defendant's motion is denied.

## I.  STANDARD OF REVIEW

This Court does not conduct a *de novo* review of the decision of the

Administrative Law Judge (ALJ) denying Social Security benefits to the

Plaintiff.  In fact, under the statutory scheme of the Social Security Act, the

reviewing court "must uphold the factual findings of the [Commissioner] if they

are supported by substantial evidence and were reached through application of the correct legal standard." ***Craig v. Chater***, **76 F.3d 585, 589 (4ᵗʰ Cir. 1996); 42 U.S.C. § 405(g).** Substantial evidence is defined as that which "a reasonable mind might accept as adequate to support a conclusion." ***Id.*** "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." ***Id.*; *Shively v. Heckler*, 739 F.2d 987, 989 (4ᵗʰ Cir. 1984).** If there is sufficient evidence to withstand a motion for a directed verdict had the case been before a jury, then the evidence is substantial and the ALJ's decision may not be overturned. ***Id.*** "It is not our place either to weigh the evidence or to substitute our judgment for that of the [Commissioner] if that decision was supported by substantial evidence." ***Hunter v. Sullivan*, 993 F.2d 31, 34 (4ᵗʰ Cir. 1992) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990).** Thus, the issue for resolution here "is not whether [Plaintiff] is disabled, but whether the ALJ's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." ***Craig, supra.***

Each party has moved for summary judgment, claiming they are entitled to judgment as a matter of law.

Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

***Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4ᵗʰ Cir. 2003) (quoting Fed. R. Civ. P. 56(e) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).** A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. ***Shaw v. Stroud*, 13 F.3d 791, 798 (4ᵗʰ Cir. 1994) (citing *Anderson, supra*).** "Regardless of whether [she] may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." ***Bouchat*, 346 F.3d at 522 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).** If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. ***Id.***

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denial of [his] pleadings," but rather must "set forth specific facts showing

that there is a genuine issue for trial." Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered."

*Id*. (quoting Fed. R. Civ. P. 56(e) and *Felty v. Graves-Humphreys Co.*, 818 F.3d 1126, 1128 (4th Cir. 1987)) (other internal citations omitted).

Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

## II.  PROCEDURAL HISTORY

Plaintiff filed her application for a period of disability and disability insurance benefits on February 19, 2003, alleging an onset date of October 11, 2002. **Transcript of Proceedings, filed December 3, 2004, at 46-48.** Her claim was denied initially and upon reconsideration. *Id*., **at 25, 32.**  The Plaintiff filed a timely request for hearing and one was conducted by an Administrative Law Judge (ALJ) on April 6, 2004. *Id*., **at 35, 241-81.**  By

decision dated April 30, 2004, the ALJ denied the Plaintiff's application for disability benefits.  *Id.*, **at 10-22.**  On August 20, 2004, the Appeals Counsel denied the Plaintiff's request for review of the ALJ's determination which then became the final decision of the Commissioner.  *Id.*, **at 5-7.**  The Plaintiff filed her action in this Court seeking reversal of the Commissioner's decision. **Complaint, filed October 4, 2004.**

## III.  FINDINGS OF FACT

The Plaintiff is a 55 year-old woman with four years of college after high school.  **Transcript, at 63, 244.**  She has worked in the medical field most of her adult life and has a lengthy history of suffering from fibromyalgia[1] and mental illness.  *Id.*, **at 245.**  She was continuously employed from 1967 through 2002 with the exception of one year.  *Id.*, **at 49-51.**  From 1981-90, she worked in a doctor's office as a medical assistant and from 1992-2002, she worked at a hospital as a nurse.  *Id.*, **at 58.**  Her work as a nurse

---

[1]"A painful rheumatic condition of uncertain cause that is characterized by diffuse or localized pain, tenderness, and stiffness of skeletal muscles and associated connective tissue and that is usually accompanied by fatigue." ***Dorland's Medical Dictionary* (28th ed.).**

included frequent lifting of 50 pounds or more and heavy lifting of 100 pounds. *Id*. This job also required her to give medications, make notations on patient charts, turn patients in their beds and/or transfer them from bed to chair, and assist them in walking in the hallways. *Id*. Her duties also required her to use medical machines, possess technical knowledge and skills, and write reports. *Id*. Her job also required her to stand and walk 10 hours each day; sit, two hours a day; and stoop, kneel and crouch, three hours a day. *Id*.

At the hearing before the ALJ, the Plaintiff testified that she is married, drives a car as needed, baby sits her grandchildren occasionally, is a registered nurse, has difficulty remembering words or other things from time to time, and cannot perform her duties as a nurse any longer because of the physical demands of that job. *Id*., **at 245-50.** Her last full time position as a registered nurse was with Grace Hospital from 1992 to 1999. Her duties at the hospital included responsibility for patients in the recovery area which required monitoring their pain medications, intravenous fluids, and vital signs *via* the telemetry monitors. *Id*., **at 251-52.** She stopped working at Grace Hospital in 1999 because she was taking Oxycontin and the hospital did not

want her working while she was taking that medication.[2] ***Id*., at 253.**  In fact,

the Plaintiff testified when she was hospitalized in November 2002, her

treating physician questioned whether or not she was abusing sedatives.  ***Id*.,

at 255.**  She also testified that she had received complaints about her work

and had difficulty getting along with co-workers and supervisors at other

medical facilities at which she had been employed.  ***See, id., at 256-59.***  The

Plaintiff testified that she was hospitalized in 1990 for mental health

problems and then again the beginning of 2000; that she has been depressed

for 30 years; that even with the newer medications, she does not feel that her

medical condition has improved and that the side effects of the medications

produce mood changes and drowsiness; that she does not feel she is able to

do any other type of work; and the medications do not help her to feel "like

[she] could go [to work] and function." ***Id*., at 263-64.**

The Plaintiff testified that she has problems keeping up with her

housework; that she still experiences severe episodes of depression where she

does not dress or leave the house for a week or more; that she spends most

---

[2]Later in the hearing, the Plaintiff testified she was fired from her job at Grace Hospital because she overlooked a doctor's orders for medication for a patient.  **Transcript, at 257.**

days watching television; and that she has difficulty sleeping.  ***Id*., at 265-68.**

She also described her problems controlling her temper and increased

irritability.  ***Id*., at 269.**  The Plaintiff also testified that she has been

diagnosed as suffering from fibromyalgia and described pain in her elbows,

feet and legs, hips, and "just about every muscle and joint in my body."  ***Id*.,***

**at 270.**  She also testified about the frequency and intensity of her migraine

headaches and the fact that she has difficulty remembering things.  ***Id*., at***

**271.**  She expressed some suicidal ideation, but testified that she has never

acted on such thoughts.  ***Id*., at 273-74.**  She also testified that she could not

do other work because she has a hard time in the mornings with weakness in

her legs and joints and the medications do not seem to help her symptoms.

***Id*., at 274.**  The Plaintiff's husband also testified at the hearing and

corroborated his wife's testimony for the most part.  ***Id*., at 274-79.**

The Plaintiff first saw Dr. Dennis Payne at Piedmont Rheumatology on

referral from another physician on April 25, 1994, complaining of persistent

pain in her joints and difficulty sleeping.  ***Id*., at 149.**  Dr. Payne's initial

diagnosis and treatment plan was as follows:

> [T]here is no evidence of any joint problems to suggest a chronic
> inflammatory arthritis.  It is possible that some of her joint pain is

related to a very low grade arthropathy[3] particularly considering
her slight stiffness, but it also could have something to do with
the anxiety and depression that she has had in the past.  I find no
tender points to suggest fibromyalgia . . . .  At this point, I am
going to give her a trial of Trilisate with Cytotec . . . in an attempt
to improve her pain.  Fortunately, her daily function has been
unchanged.  We will plan to see her back . . . after trying the
proposed treatment.

*Id*., at 150 (footnote added).  The next medical record from Dr. Payne is

dated January 29, 2002; the Plaintiff continued to complain of "widespread,

unspecified pain" and difficulty sleeping.  Dr. Payne changed his diagnosis to

that of fibromyalgia.  *Id*., at 148.  Dr. Payne's progress notes for the period

April 18, 2002, through March 17, 2004, reveal that he continued to treat

Plaintiff for the fibromyalgia and on December 2, 2002, first diagnosed her as

suffering from bipolar disorder as well.  *Id*., at 141-47; 189-93.  Although

various medications were prescribed to treat Plaintiff's symptoms, none of the

treatment regimens improved either her pain or depression.  *Id*.

From February 14, 2002, until November 6, 2002, the Plaintiff saw Dr.

Karl V. Schroeder, M.D., a psychiatrist with Grace Associates.  *Id*., at 93-97.

Dr. Schroeder's notes from the Plaintiff's initial visit indicate that she had a

problem with weight gain due to the medication Remeron.  He reduced the

---

[3]"Any joint disease."  ***Dorland's, supra.***

Remeron to a half pill each day for four days and the Plaintiff was then to discontinue its use.  Likewise, the medication Paxil was reduced to 20 mg. each day for a week and then discontinued.  He also began the Plaintiff on Prozac 20 mg. each day and advised her to return in six weeks.  *Id.*, at 97.

On March 28, 2002, the Plaintiff complained that the Prozac was not helping and she was having difficulty sleeping.  Her medications were reviewed and changed and she was to return in one month.  *Id.*, at 96.  Her next visit was recorded as June 24, 2002, where she related a series of family-related tragedies.  *Id.*, at 95.  She also advised Dr. Schroeder that she had returned to work, liked her new job, but that she was still having difficulty sleeping through the night.  Again, her medications were changed and she was advised to return in four months.  *Id*.  At the visit on October 10, 2002, Dr. Schroeder noted that "overall things are going fairly well," and changed her Paxil medication to Lexapro.  *Id.*, at 94.  However, on November 6, 2002, Dr. Schroeder advised that in the prior three days, the Plaintiff had an "extreme change" in her behavior and become "hyper-irritable.  She has had thoughts that she could truly kill her husband . . . . She has had thoughts about suicide."  *Id.*, at 95.  Because of these symptoms, Dr. Schroeder suspected

the Plaintiff was experiencing a manic episode and arranged for her to be hospitalized. *Id.*

The Plaintiff was hospitalized on November 6, 2002, at Memorial Mission Hospital in Asheville, North Carolina, where she was treated by Anthony J. Weisenberger, M.D. *Id., at 98-133.* Dr. Weisenberger's initial assessment was that the Plaintiff was suffering from bipolar disorder (not otherwise specified), chronic medical problems (migraine headaches, fibromyalgia, recent gallbladder surgery), and chronic unstable mood disorder. *Id., at 122.* After a 12-day stay in the hospital, the Plaintiff was discharged with "normal mood, not manic or depressed." *Id., at 100.* She was prescribed a variety of medications to stabilize her moods as well as to address her reflux disease and migraine headaches. *Id.* He recommended that she continue outpatient therapy, regularly attend a narcotic anonymous group, and follow up with her treating physicians as needed. *Id.* Dr. Weisenberger opined that the Plaintiff was "not now able to work due to her psychiatric problems, but has no other clear physical limitations[,]" but that her prognosis was fair if she "stays on mood stabilizing medications, [and] away from Hydrocodone, or Fiorinal or Fioricet and Soma." *Id., at 101.*

From January 22 through December 17, 2003, the Plaintiff was seen by Suzanne R. Yoder, M.D., with Carolina Treatment Associates, an out patient mental health service, by referral from Dr. Schroeder as he was closing his practice. *Id.*, at 135-40; 180-88. On the initial visit, Dr. Yoder agreed with Dr. Weisenberger's diagnosis of bipolar disorder and was suspicious that the Plaintiff might also have a history of substance abuse. *Id.*, at 139. Because the Plaintiff had managed a 20 pound weight gain on her current medication Zyprexa, this medication was changed to Depakote and she was to return in one month. *Id.*, at 140. In February 2003, Dr. Yoder opined that the Plaintiff was "[not] able to go back to work at this time[;]" however, she recommended the Plaintiff volunteer as a school nurse as a way of getting out of the house and "continuing her nursing skills." *Id.*, at 136. In March 2003, Dr. Yoder noted that the Plaintiff's grooming had significantly improved and that she was not tearful during the interview. *Id.*, at 135. Dr. Yoder further noted that the Plaintiff's "speech was of normal cadence and tone and not rapid or pressured. Her thought processes linear and goal directed without flight of ideas. There is no evidence of mania or hypomania. Patient not suicidal, homicidal or psychotic. Mood she described as better." *Id.*

On March 10, 2003, Perry A. Caviness, M.D., DDS Medical Consultant, evaluated Plaintiff's physical residual functional capacity after review of the medical evidence submitted to date in support of her disability application. *Id*., **at 172-79.** Dr. Caviness opined that the Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds; that she could stand/walk and sit 6 hours in an 8-hour workday; that she was unlimited in her ability to push/pull or operate hand and/or foot controls; that she had no postural, manipulative, visual, or communicative limitations; but that she should avoid concentrated exposure to hazards such as machinery and heights. *Id*., **at 173-76.** Dr. Caviness diagnosed the Plaintiff as suffering from fibromyalgia and opined that she had a "medium" residual functional capacity with the physical limitations listed above. *Id*., **at 179.**

Likewise, a psychiatric review technique was completed by E. J. Burgess, Psy.D. on March 19, 2003, based on the Plaintiff's medical records to date. *Id*., **at 153-71.** While Dr. Burgess diagnosed the Plaintiff as suffering from "[b]ipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)," he

found her to be only mildly limited in activities of daily living and moderately limited in maintaining social functioning and concentration.  *Id*., at 156, 163. On the mental residual functional capacity assessment, Dr. Burgess opined that the Plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and in her ability to work in coordination with or proximity to others without being distracted.  *Id*., at 168. He further opined that the Plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers; to respond appropriately to changes in the work setting; and in her ability to set realistic goals or make plans independently of others.  *Id*., at 169.  Dr. Burgess further stated that although the Plaintiff would have difficulty understanding and remembering detailed instructions, she would be able to maintain attention and concentration for at least two hours in order to perform simple, routine, repetitive tasks in a low stress environment.  *Id*., at 170.

The Plaintiff's visit to Dr. Yoder in April 2003 revealed no evidence of depression or mania and her mood was described as good.  *Id*., **at 188.** However, on her next visit to Dr. Yoder on June 23, 2003, she was described as "tearful," "affect was flat," and mood was depressed.  *Id*., **at 187.**  On July 24, 2003, Dr. Yoder discussed with the Plaintiff the importance of adhering to the prescribed medication regimen as Plaintiff was inclined "to want to overuse her benzodiazepine to medicate herself as she is partially noncompliant with her medication regimen."  *Id*., **at 185.**  Her medications were adjusted and Dr. Yoder diagnosed the Plaintiff as suffering from "Bipolar disorder type I, [and possibly] the combination of cyclothymia[4] and borderline personality disorder . . . .  *Id.* **(footnote added)**.  In August 2003, Dr. Yoder observed that while the Plaintiff was improved from the last visit, a moderate degree of depression was present.  *Id*., **at 183.**  At the September 22, 2003, visit, Dr. Yoder changed her diagnosis to "cyclothymia, possible bipolar type II, borderline personality disorder and major depression, recurrent, severe without psychotic features . . . ."  *Id*., **at 181.**  The last visit to Dr. Yoder

---

[4]"A mood disorder characterized by numerous hypomanic and depressive periods with symptoms like those of manic and major depressive episodes but of lesser severity."  ***Dorland's, supra.***

contained in the record is dated December 17, 2003; the diagnosis and prognosis remained the same, although Dr. Yoder changed the medication regimen by deleting Geodon (Plaintiff had stopped taking it on her own and reported doing well without it). Dr. Yoder noted that the Plaintiff was getting out of the house more, her appetite was adequate, and her concentration was better. She also reported that the Plaintiff had suffered no significant manic or depressive phases since the last visit and reported no side effects from her medication. Plaintiff was to return in one to two months. *Id.*, at 180.

The above summary of the medical record reflects a profuse and continuous series of physical and mental problems suffered by the Plaintiff beginning before 1989. These problems range from minor complaints (such as skin rash, sinusitis and ingrown toenails) to major impairments of fibromyalgia, bipolar disorder, and depression. A review of the record also shows that throughout Plaintiff's working years, her relationships with her employers and coworkers was less than satisfying. It is apparent that the cause of such difficulties was the increasing severity of the Plaintiff's physical and mental impairments during that time period. In sum, for the reasons set forth below, the case is remanded to the Commissioner for further review and rehearing.

# IV.  DISCUSSION

Disability under the Social Security Act means the inability to engage in any substantial gainful activity due to a physical or mental impairment expected to result in death or to last for a continuous period of not less than twelve months.  The Plaintiff alleges an onset date of disability of October 11, 2002, due to fibromyalgia and mental disorders.

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process.  **20 C.F.R. § 416.920.**  If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied.  ***Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).**  First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant.  ***Id*.**  The ALJ concluded the Plaintiff was not engaged in substantial gainful activity.  Thus, he proceeded to the second step at which the applicant must show a severe impairment.  If the applicant does not show any impairment or combination thereof which significantly limits the physical or mental ability to perform work activities, then no severe impairment is shown and the applicant is not disabled.  ***Id*.**  Third, if the impairment meets or equals one of the listed

impairments of Appendix 1, Subpart P, Regulation 4, the applicant is disabled regardless of age, education or work experience. *Id***.** Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. *Id***.** Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. *Id***.** In this case, the ALJ's determination was made at the fifth step.

Plaintiff first contends that the ALJ erred by relying on the Grids in reaching his decision since all of her claimed impairments are non-exertional. The ALJ found that the Plaintiff had proved that she could not return to her past relevant work, which is classified as skilled work, but that she did have transferrable skills with a residual functional capacity for medium, unskilled work. **Transcript, at 19-20.** He further concluded that the Plaintiff was able to perform a full range of medium work and was, therefore, not disabled

pursuant to Medical-Vocational Rule 203.24. *Id*., at 20. At this point, the

burden shifts to the Commissioner to show that alternative job opportunities

exist in the national economy which the Plaintiff could perform. *McLain v.*

*Schweiker*, 715 F.2d 866 (4th Cir. 1983).

> If the claimant has no nonexertional impairments that prevent her
> from performing the full range of work at a given exertional level,
> the Commissioner may rely solely on the Grids to satisfy [her]
> burden of proof. The Grids are dispositive of whether a claimant
> is disabled only when the claimant suffers from purely exertional
> impairments. In the case of a claimant who suffers from
> nonexertional impairments, or a combination of exertional and
> nonexertional impairments that prevent her from performing a full
> range of work at a given exertional level, the Grids may be used
> only as a guide. In such a case, the Commissioner must prove
> through expert vocational testimony that jobs exist in the national
> economy which the claimant can perform.

*Aistrop v. Barnhart*, 36 Fed. Appx. 145, 146-47 (4th Cir. 2002) (citing 20

C.F.R. § 404.1569a (2001); *Walker v. Bowen*, 889 F.2d 47, 49-50 (4th Cir.

1989)) (other internal citations omitted). "A nonexertional limitation . . . is a

limitation that is present whether the claimant is attempting to perform the

physical requirements of the job or not, such as . . . mental illness . . . . Such

limitations are present at all times in a claimant's life, whether during exertion

or rest." *Gory v. Schweiker*, 712 F.2d 929, 930 (4th Cir. 1983); *see also*,

**20 C.F.R. § 404.1569a(c) (list of nonexertional limitations); § 404.1569(d)**

**(list of combined exertional and nonexertional limitations).**

> [The Court] recognize[s] that not every nonexertional malady rises to the level of a nonexertional impairment, so as to preclude reliance on the grids. The proper inquiry . . . is whether the nonexertional condition affects an individual's residual functional capacity to perform work of which [she] is exertionally capable. [The Fourth Circuit] has held that whether a given nonexertional condition affects a particular claimant's residual functional capacity to perform a certain range of jobs is a question of fact. [The Court] concludes that there was no substantial evidence in this case to support the ALJ's finding that [the Plaintiff's] capacity to perform [medium] work was not compromised by [her] emotional depression [and fibromyalgia].

*Tawney v. Bowen*, 861 F.2d 266 (table), 1988 WL 113016 (4th Cir. 1988)

**(citing *Grant v. Schweiker*, 699 F.2d 189 (4th Cir. 1983)) (other citations**

**omitted).**

In this case, the ALJ committed error by failing to call a vocational expert to support the Commissioner's burden of proof at Step Five of his analyses. The Plaintiff established at least a *prima facie* case of exertional and nonexertional limitations. The ALJ further failed to fully explain and justify his conclusion that these limitations had not compromised the Plaintiff's capacity for medium work. The record is replete with evidence that the Plaintiff had a 30-year history of depression, three hospitalizations due to

her mental illness (the last one in 2000), recurrent inability to control her temper, fibromyalgia with pain in her joints so severe that she acquired an addiction to prescription pain killers, medical records from psychologists and psychiatrists of her severe mental problems, and evidence of an inability to function normally in a traditional work setting. It is incumbent on the undersigned to order that a new hearing be conducted with a more careful analysis and explanation of the weight given or not given to this evidence, much of which is undisputed. At this hearing, the Commissioner must come forward with evidence to show that with the Plaintiff's established limitations, there are jobs in the national economy which she can perform. ***See, McLain, supra.***

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's motion for summary judgment is hereby **GRANTED** and the Defendant's motion for summary judgment is hereby **DENIED.** A Judgment reversing the Commissioner's decision and remanding this case is filed herewith.

**Signed: November 7, 2005**

Lacy H. Thornburg
United States District Judge